Filed 9/9/14  In re K.B. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re K.B. Jr., a Person Coming Under the Juvenile Court Law. | D065227 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. SJ12289A) |
| v. | |
| A.R., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Suzanne F. Evans, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel and J. Jeffrey Bitticks, Deputy County Counsel, for Plaintiff and Respondent.

Terrence M. Chucas, under appointment by the Court of Appeal, for minor.

A.R. (Mother) appeals from a judgment terminating her parental rights following contested hearings under Welfare and Institutions Code[1] sections 388 and 366.26. She contends the juvenile court abused its discretion by denying her section 388 petition seeking return of her child K.B., claiming she addressed the concerns that had prompted K.B.'s removal by the San Diego Health and Human Services Agency (Agency). Stating her progress is "substantially comparable" to that of the father in *In re S.B.* (2008) 164 Cal.App.4th 289, Mother further contends she established both prongs of the parental-child beneficial exception to adoption (§ 366.26, subd. (c)(1)(B)(i)), warranting denial of Agency's section 366.26 petition to terminate her parental rights. We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In December 2009, Agency filed a section 300 petition alleging that then 16-month-old K.B. came within the juvenile court's jurisdiction for Mother's failure to protect him under section 300 subdivision (b). Agency alleged Mother had ingested 15 unprescribed Klonopin pills while caring for K.B. and was treated for a possible drug overdose. A welfare check of the home revealed three pipes containing methamphetamine residue in the room where K.B. slept with Mother and her boyfriend, Donald K., as well as a steak knife and cigarette lighter in K.B.'s crib. Mother admitted using methamphetamine a few days earlier. K.B.'s father's whereabouts were unknown. K.B. was eventually ordered detained in a foster home.

---

1     Statutory references are to the Welfare and Institutions Code unless otherwise specified.

In a jurisdiction/disposition report, a social worker summarized her interview with Mother, who denied owning the methamphetamine pipes or doing drugs, and denied that K.B. was sleeping in his crib where the knife and lighter were found. Mother reported that she left K.B.'s father due to his violence toward her and had obtained a restraining order against him that terminated in 2012. She was living with Donald K. and his family.[2] The social worker reported that Mother and Donald K. had been referred for substance abuse testing but failed to appear. Though Mother had supervised visits with K.B., the foster mother reported Mother "[did] not seem to know much" about K.B., and would simply put him in his crib with the television on to fall asleep, and gave him soda instead of Pedialyte for his ear infection because "he likes [it] a lot." When the foster mother responded that K.B.'s teeth were rotting, Mother said it was because of his bottle,

[2]     The record shows that Agency was initially concerned about mother's involvement with Donald K., who was later arrested on May 15, 2010, for transportation and possession for sale of methamphetamine. At various times in 2010, social workers criticized mother for continuing to insist that Donald K. and his family have access to K.B. when it was not authorized, bringing Donald K. to K.B.'s visits, maintaining her relationship with Donald K., continuing her dependence on him and his family, and encouraging K.B. to refer to Donald K. as "dada." Social worker Teresa Acevedo felt mother did not understand her sobriety was in jeopardy by continuing to live with and be reliant on another drug-dependent individual (Donald K.), knowing this was one of her "triggers." Ultimately, Agency recommended that K.B.'s brother, D.K., born in June 2011, would be placed with Donald K. in family maintenance services, the parties agreed to that recommendation, and the juvenile court terminated its jurisdiction as to D.K. As to K.B., Agency eventually had no issue with Donald K.'s past; it plainly felt K.B. was best served by his placement with and adoption by Donald K.'s parents, although Donald K., D.K., and K.B. would live in the same home. At the section 366.26 hearing, a social worker testified that the allegations and concerns about Donald K. were investigated and no longer existed as of July 2013.

not the soda.  The foster mother observed K.B. did not appear close to Mother and did not cry when he left her.

In March 2010, the juvenile court referred Mother to SARMS (substance abuse recovery management system) for substance abuse treatment and case management services.  At a document trial on K.B.'s jurisdiction/disposition hearing the court removed K.B. from Mother's custody, ordered him placed in a licensed foster home, and ordered services for Mother.

In April 2010, Agency located K.B.'s father, who was residing in Hawaii.[3] Agency could not locate willing and able relatives to care for K.B.  Social worker Acevedo reported that during that same month, Mother had attempted to involve Donald K. in her supervised visits and had "continuously became enraged" about his exclusion, making a scene in front of K.B. and frightening him.  According to Acevedo, when told how detrimental her aggressive behavior was to K.B., Mother "did not seem to care."

Acevedo reported in addendums that in May 2010, Mother was reported to have a positive drug test for marijuana, but when Mother was confronted with the test results, she denied using the substance, claiming she was only in the presence of others using drugs.  Mother later admitted to Acevedo that she had "screwed up" and lied; that she had

---

[3]    K.B.'s father is not a party to this appeal, thus we omit background information related to his involvement with K.B. and Agency.  This court affirmed a judgment terminating reunification services to him in *In re K.B., Jr.* (Apr. 28, 2011, D058691) [nonpub. opn.].  K.B.'s father had no contact with Agency between late May 2010 and July 2010.  Agency learned he was arrested on May 14, 2010, for an outstanding warrant after being found intoxicated.  He was again arrested in July 2010 after wielding a knife and flashlight and attacking a man helping father's ex-girlfriend.  In November 2010, the court terminated father's services.

used marijuana. Mother failed to undergo drug tests on three additional occasions and had a diluted test. Substance abuse counselors had reported Mother was slow in progress and, while attentive, was not participatory.

In July 2010, Mother was ordered and agreed to participate in dependency drug court. As of August 6, 2010, the court reported her compliant with 21 days of sobriety. However, Acevedo later reported that Mother had left her residential treatment program on August 2, 2010. Mother eventually enrolled in outpatient services. Acevedo also reported that while Mother's visits had been consistent for the most part and her behavior good, she continued to bring unauthorized people to the visits. Acevedo recommended that the court terminate Mother's reunification services.

In an addendum report for the six-month status review hearing, social worker Acevedo reported that in September 2010, Mother and Donald K. had been stopped by police, who checked their home and found a smoking device on the night table containing methamphetamine residue, as well as a digital scale. The next day, Mother did not disclose her police contact to the social worker. She claimed to be attending Narcotics Anonymous (NA) classes, but did not provide proof. Acevedo expressed concern that Mother was concealing her circumstances, and her attempts to make changes were not genuine. Mother had not completed the most basic portion of her case plan: she had finished only three of 14 parenting classes.

In an addendum, Acevedo reported that in September and October 2010, Mother had tested dilute twice, and failed to test once. Acevedo had been informed that Mother was four to five months pregnant, yet she was smoking cigarettes, failed to drug test and

had tested dilute, which was considered a positive test. Acevedo stated Mother was "clearly not" applying what she had learned from therapy and drug treatment to her life situations so as to show K.B. would not reenter the same situation from which he was removed. Mother had stopped attending NA/AA meetings, and did not have a sponsor. Acevedo reported that while Mother was participating in services, she had not demonstrated any real change.

The contested six-month status review hearing took place in November 2010, at which time the court ordered that K.B. continue to be placed in a licensed foster home. In November 2010, the court continued services to Mother, who it found had made some progress with her case plan.

In a report for the 12-month status review hearing, Acevedo observed that Mother had been attending therapy and substance abuse treatment. However, while she had been attending NA/AA meetings, she still did not have a sponsor. Acevedo reported that Mother's complaints of K.B.'s foster home placement in Oceanside and the climate between her and his caregivers had resulted in the caregivers giving notice, and Agency had to find another placement for K.B. Acevedo observed Mother's visitations with K.B. were appropriate, but she had to make improvements and demonstrate a longterm dedication to sobriety. Mother continued to assert that everyone involved in her case had "wronged" her.

At the February 2011 12-month status review hearing, the court found Mother had made substantive progress with her case plan, and ordered Agency to continue services to her. K.B. was again ordered placed in a licensed foster home.

For Mother's 18-month review hearing, Agency recommended Mother be given an additional six months of services. Social worker Acevedo reported that Mother had been attending services and doing well; that she completed drug court in April 2011 and graduated from the South Bay Women's Recovery Center in May 2011. Mother had also been attending NA and AA meetings as required, was engaged in individual therapy, and had regular visitation including overnight visitation with K.B. Mother was living with her maternal aunt, and was due to give birth in June 2011. Mother and K.B. were in once-a-week therapy separately and together, and K.B. showed affection and was happy in Mother's presence. Acevedo recommended that K.B. be placed with Mother.

The juvenile court adopted Agency's recommendations, and in June 2011 ordered K.B. placed with Mother. It ordered continued services and set a maintenance review hearing for December 2011. Before that hearing, however, Mother's whereabouts became unknown and Mother stopped returning social workers' calls. Agency sought a continuance to obtain information about Mother's circumstances. Two weeks later, social worker Christina Morse reported that Mother had ended her therapy sessions in June 2011 when she gave birth to D.K., a son from Donald K. K.B., who was then age three, was hitting, kicking, not sharing and having tantrums at school. Mother reported she was attending two to three NA/AA meetings a week, but Morse never received her meeting slips, and though Mother claimed to be on the fourth step, she was unable to describe that step to Morse. However, Mother's December 13, 2011 on-demand drug test was normal. Agency recommended K.B. remain with Mother and that they receive six months of family maintenance services.

Social worker Morse provided a status on June 20, 2012. She reported Mother was unemployed and homeless; she had been living from motel to motel since May 2012 and was supporting her children with public assistance. Mother had been lying to Agency for the past year about her living circumstances, and she in fact had been living with Donald K., then with her father, and then with another man, George S., who had an extensive criminal history of domestic violence, drug charges and theft. Also, in June 2012, new allegations had arisen that were under investigation: that her father had picked K.B. up by the arm, dangled him, and spanked him on the bottom while Mother was residing in his home; that Donald K. yelled at the younger son and hit him with an open hand across his face; and that Mother's aunt came to Mother's hotel room and removed her Klonopin so that Mother would not overdose on the medication. Both Mother and Donald K. had filed abuse allegations against each other in family court. Morse reported that K.B. had no health concerns and his immunizations were up to date, but he was still hitting, kicking and having tantrums at school, though with less frequency. While K.B. was participating in therapy sessions at school, he and Mother were no longer seeing their therapist, and Mother had not followed through with referrals for speech and behavior modification services for K.B.

Mother had claimed to be attending NA/AA meetings, but Morse learned she had used an unauthorized NA/AA stamp to sign attendance sheets. Mother also admitted to Morse that she used the synthetic marijuana "Spice," and that she had last smoked it in February or March. Though Mother had negative drug tests in December 2011, and April and May 2012, drug testing specialists confirmed that Spice would not show up on a drug

8

test.  Mother had stopped taking her prescribed psychotropic medication.  Agency created safety plans for Mother, and Mother agreed not to have contact with either Donald K. or George S., to resume her medication, meet with her treating physician, resume her individual therapy, and seek permanent housing.

Though Agency had recommended K.B. remain with Mother and she receive six additional months of maintenance services, a month later it filed a section 387 petition asking that K.B. be removed from her care and placed with a foster caretaker.  Agency alleged Mother was no longer willing or able to provide K.B. adequate care and supervision in that she had been living with George S., who had an extensive criminal history, and was no longer using her prescribed psychotropic medication or consulting with her treating physician.  In a lengthy detention report discussing the recent events including Mother's dishonesty and synthetic marijuana use, social worker Morse summarized the June 2012 referrals regarding Mother and reached conclusions about them.  Morse recounted family court allegations from Donald K. concerning his relationship with Mother and Mother's mistreatment of the children, and Mother's responsive allegations.  Morse reported that Mother had denied having further contact with George S. after Agency told her to have no contact, but eventually admitted he had been to the hotel where she was staying.  She also admitted getting pregnant with George S.'s child and miscarrying.  Morse expressed concern about Mother's inability to follow through with housing referrals, her inability to inform the Agency of violent or abusive events until after they occurred, and her unstable mental health.  She set forth her interviews with Mother, Donald K., Mother's maternal aunt, Donald K.'s parents, and

9

children K.B. and D.K. Agency recommended Mother return to services to address her ongoing poor judgment, mental health symptoms, drug use, and relationship problems as well as further develop her parenting skills. In July 2012, the juvenile court ordered K.B. detained with Polinsky or another approved foster home.

The court set the matter for a contested jurisdictional and disposition hearing, and in the interim ordered the parties to attend a settlement conference. In September 2012, Mother relocated to Northern California to live with her mother. At the December 5, 2012 settlement conference, the juvenile court adopted Agency's recommendations, continued K.B. as a dependent child, and removed him from Mother. It ordered K.B. placed with a non-relative extended family member (NREFM), terminated Mother's services but ordered visitation, and set the matter for a section 366.26 selection and implementation hearing.

In a March 2013 report prepared for the upcoming section 366.26 hearing, Agency sought a 90-day continuance to assess the case. Social worker Keisha Blair reported that as of September 2012, K.B. was placed in the NREFM home of Donald K.'s parents, Edna and Walter H. K.B. was with his brother, D.K., who had been placed with Donald K. in the same home. Blair observed K.B. had had eight placements over his lifetime. Though Blair had been on the case since January 2014, Mother had not contacted her to inquire about her children or request visitation, and she had not had any opportunity to witness Mother's visits with K.B. Blair reported that K.B. was generally and specifically adoptable, and Edna and Walter H. had expressed an interest in giving him a permanent home through adoption. Blair sought additional time to assess the caregivers in part

10

because there was a current physical abuse referral and Donald K. had informed Blair that his Mother was only adopting K.B. to give him to Donald K.

In May 2013, Mother filed a petition under section 388 seeking an order placing K.B. with her. Agency issued addendum reports in June, November and December 2013 for the section 366.26 hearing.[4] In June 2013, social worker Blair reported that Mother had been contacting K.B. once a week since mid-March 2013 and having brief conversations with him. She had not requested visitation, nor had she contacted Blair to inquire about K.B.'s well-being. Blair reported that K.B. was an attractive four year old who had no major health or developmental problems, and he was affectionate and engaging with his caregivers Edna and Walter H., who continued to express their commitment and desire to provide K.B. with permanence through adoption. Blair recommended the court deny Mother's section 388 petition. She reported that while Mother claimed to have undergone changed circumstances, there was no evidence she had a safe home, was taking all of her prescribed medication, or was consulting with a psychiatrist. When asked, K.B. stated he wanted to live with his grandmother Edna and "daddy" (Donald K.), where he had been living since September 2012. His caregivers began to develop their relationship with K.B. when he was nine months old; they ensured

---

[4] After the initial April 3, 2013 continuance for the section 366.26 hearing, the court on July 1, 2013, set the matter for contested joint section 388 and section 366.26 hearings. In August 2013, the matters were again continued to October 2013 due to the unavailability of D.K.'s social worker. In October 2013, the matter was again continued because one of the attorneys was leaving for vacation the next day and could not complete the trial. On the date set for trial, November 8, 2013, mother's counsel declared a conflict. A few days later, the court appointed new counsel and the matters were set for trial in January 2014.

11

K.B. attended all of his medical appointments and K.B. looked to them to meet his needs when he was injured or needed comforting. Blair concluded there was no parental relationship between K.B. and Mother; she recommended Mother's parental rights be terminated and adoption to be the most appropriate plan.

In November 2013, social worker Amy Ausderan made the same recommendations. She reported there had been several referrals to Agency concerning Mother and her newborn daughter, and that in September 2013, workers who were visiting Mother's home found Mother confused, "almost stoned," with slowed speech and having difficulty grasping what workers were saying. Mother stated she was taking medication for her severe anxiety, but did not show it to the worker, claiming it was in a bedroom where the baby's father was sleeping. The worker expressed concern that the baby was left in her bassinet for long periods of time and when Mother blamed the child's grandmother, the worker had to tell her she was ultimately responsible for her daughter's care if she was to leave her for long periods of time. Mother responded, "Well I guess I'll have to find a new babysitter then." Though Agency documented concerns over the cleanliness of the house and the baby's yeast infections, the general neglect referral was eventually closed as unfounded.

Ausderan reported that K.B.'s attorney had spoken with K.B.'s therapist, who had very positive things to say about the caregivers' commitment and participation in K.B.'s therapy. K.B.'s therapist had observed in one visit that Donald K. was appropriate, and that K.B. did not fear him in any way. Mother's only contact with K.B. had been weekly phone calls; she had never requested visitation and at times Mother became irate and

12

inappropriate during the calls. Though Mother had been appropriate during two supervised visits in July 2013, Mother had not demonstrated an ability to provide for K.B.'s physical, emotional, or medical needs on a consistent basis, she was unable to address her substance abuse addiction, and she did not maintain a consistent presence in K.B.'s life. Ausderan stated K.B. enjoyed his visits with Mother, but their relationship did not rise to the level of a parent-child bond and did not outweigh the benefits of permanency, stability and safety that adoption would provide. Mother still had not given Agency proof of her completion of a substance abuse treatment program, negative drug test results, and her compliance with a psychotropic medication regimen or consultation with a mental health professional. Ausderan stated Mother had a history of drug abuse that needed to be addressed, and it was not in K.B.'s best interest to be placed with her, as he had had numerous placements and needed a stable, drug- and violence-free home where his needs were met. According to Ausderan, K.B.'s current home with his caregivers met all of those basic needs.

Mother had two supervised visits with K.B. and his brother on November 13 and 14, 2013. Mother arrived on time and brought candy and a toy for K.B. She had purchased pizza kits for the children to make and was very playful and energetic, giving the boys praise when they made good choices. K.B. did not appear to experience distress upon separating from Mother at the end of the visit; he did not cry or ask to stay longer, and he appeared eager to go with his caregiver and separated with ease. The next day, Mother was excited to see and hugged K.B., who did not initiate any outward display of affection, but did not object to Mother's touch. She brought food and drink, but

13

understood K.B. had eaten at school.  Mother was very playful, riding down the slide, pushing the boys on bicycles, and holding K.B.'s hand while he rode a skateboard.  She drew a picture of her, K.B. and his brother on a chalkboard and told them she was saying, "I love you."  K.B. did not respond but retrieved some toys and began playing on his own.  After a while, Mother encouraged K.B. to play with them, then asked him to give her a big hug.  K.B. hugged her.  K.B. separated easily from Mother and went with his caregiver easily.  Though Mother had scheduled another visit, she cancelled it because she did not want K.B. playing outside in the cold weather.

*Mother's New Section 388 Petition*

In January 2014, Mother withdrew her May 2013 petition and filed a new petition under section 388 asking the court to vacate the section 366.26 hearing, place K.B. with her, and order family maintenance services, or alternatively for a lesser permanent plan such as long term foster care.  Mother claimed she and K.B. were sufficiently bonded to suggest reunification was possible and beneficial.  She also claimed she had been managing her health via consistent care and had followed her medication regimen for many months.  Mother attached letters from physician's assistants.  One stated Mother had been actively searching for work, and she had expressed a desire to be healthy and a positive contributor to the community.

*Combined Section 366.26 and Section 388 Contested Hearings*

On January 7 and 8, 2014, the juvenile court heard Mother's section 388 petition and the contested section 366.26 matter; the parties stipulated that the testimony and admitted evidence would be considered for both matters.

14

Mother testified that since June or July 2013 she had been under the care of "telemed" psychiatrists with Ampla Health for her anxiety, depression and insomnia, and was taking medications Ativan, Trazodone, Abilify, Effexor, Prilosec, Demerol and Benadryl for her conditions. She felt the medications helped her with her insomnia, anxiety and depression, and she was a "completely changed" person. Though Mother testified she was clean and sober, she was not engaged in any drug or alcohol rehabilitation (claiming she was caring for her daughter), nor was she attending N.A. or A.A. meetings. Mother's last time in rehabilitation was October 2012 when she underwent nine months of outpatient treatment and one month of inpatient treatment. She had been living in Gerber, California for just over a year and was in a month-to-month housing arrangement.

Mother testified she tried to call K.B. every day and left messages, but only actually spoke with him once or twice a week, or sometimes not at all. Her longest call was 10 minutes, and she testified that when she called K.B., he would ask her when she was coming to see him and live with him. She saw him on the last court date in July and also in November when she brought food and played with him. Mother had a room set up for K.B. in her home with a bed and desk for homework.

Social worker Ausderan testified that though Agency had recommended that Mother engage in substance abuse treatment, it had no information that she had done so since July 2012 when K.B. was removed from her care. At that time, Mother was not taking her prescribed medication because she wanted to prove to her family that she did not need it. Agency had also recommended Mother participate in medication

15

management treatment and asked Mother to provide documentation for that, but it received only a letter that was unspecific about her medications, diagnosis or whether a mental health professional was involved, and Ausderan never received a return call on her follow up inquiries. Mother never complied with parent/child attunement therapy as Agency had recommended. Agency had not restricted the number of times Mother could visit K.B. nor had it prohibited her from traveling and seeing him in a supervised setting, yet Mother saw K.B. only five times since her move to Northern California: twice in July 2013, once in September 2013, and twice in November 2013. Nor had Agency precluded Mother from participating in K.B.'s therapy, schooling or education. Though Ausderan did not observe Mother and K.B.'s initial greetings during recent visits, she did not see K.B. taking the initiative to have physical or emotional contact with Mother such as hugging or kissing her, and he was not distressed or sad at the end of the visits. K.B.'s caregivers told her he did not ask to see or call her. Mother had never participated in K.B.'s therapy; his caregiver Edna took him to his weekly visits, participated in in-home programs, attended his individualized education plan meetings, and attended other meetings and parent/teacher conferences. K.B. had shown improvement with therapy. He was swearing less, able to calm down faster and accomplish some tasks.

Ausderan testified that K.B. was very attached to his caregivers and household members, and wanted to live with "daddy," referring to Donald K., who lived with K.B.'s brother in the same household as K.B.'s caregivers. K.B. had had eight placements, which compelled against moving him again, and he presently had consistency and stability with his caregivers. Ausderan felt it was in K.B.'s best interest to maintain his

16

relationship with his brother D.K.; they were close siblings, enjoyed being together, and had lived together for D.K.'s entire life. Agency still recommended denial of Mother's request for placement because K.B. was in a stable home attached to his current caregivers, who were willing and able to provide him with longterm care and services from which he was benefitting.

According to Ausderan, even assuming Mother's testimony was true, Agency had no knowledge of significant progress in Mother's treatment, and felt it was not in K.B.'s best interests to live with Mother. Ausderan pointed to Mother's history of substance abuse but lack of aftercare treatment, and expressed concern about Mother's history of overdosing on medication or not taking the prescribed amount, which needed to be continually addressed. Since July 2012, Mother had not provided Agency with information showing she was maintaining stability on her medications. Even if Mother had been taking prescription medication for four months as she had claimed, Ausderan testified it was not a significant amount of time in relation to Mother's history; Ausderan wanted to see Mother with at least a year to a year and a half of stability on prescription medication. Ausderan testified it would not be detrimental to K.B. if Mother's parental rights were terminated; Mother had failed to maintain her role as a parent, had only minimal contact with him, and was not providing his day to day care.

Stephen Grant, an Ampla Healthcare Center physician's assistant, was telephoned and sworn in. He testified he had written a letter on Ampla letterhead in December 2013 on Mother's behalf based on an approximately 20-minute conversation with her. Grant testified Mother seemed to be taking her medication and doing well on it, and saw no

17

evidence of depression or anxiety.  However, he could not recall reviewing Mother's medical records, did not recall her mental health history nor was familiar with her medications, and did not know how many times she had been seen at Ampla.  Grant had no information about the child protective services allegations against her.  The juvenile court excluded Grant's December 2013 letter on hearsay grounds, and also excluded certain documents purporting to show Mother's prescriptions.

The court denied Mother's section 388 petition.  It acknowledged that Mother was trying to turn her life around and had made efforts to stay on appropriate medication.  However, it also took into account Mother's four-year history of compliance and relapse, and ruled the circumstances showed only the beginning of change, not the sort of change that would permit K.B.'s return to Mother.  The court pointed out that due to Mother's move it did not have the sort of Agency supervision that would allow a social worker to testify about changes Mother had made.  Further, the court found due to the lack of significant visitation by Mother, the significant bonding between K.B. and his caretakers, and the stability of K.B.'s current placement, it would not be in his best interests, but in fact detrimental to his emotional and mental stability, to return him to Mother.  Thus, the court concluded it did not have evidence to show a change had actually taken place; and despite Mother's positive steps it could not find changed circumstances warranting the requested relief by any evidentiary standard.

As for Agency's petition under section 366.26, social worker Blair testified that though Agency had had previous concerns that one of the caregivers intended to give Donald K. sole responsibility for K.B.'s care, Agency no longer had that concern in view

18

of the fact the caregivers had participated in Agency's recommended services, and they had shown they were dedicated to giving K.B. permanency. Blair pointed out the caregivers had an extended family home with Donald K. living in the same home as K.B., and had clarified that they were all going to participate in K.B.'s care, not merely adopt him and give him to Donald K. Blair acknowledged Donald K.'s past drug possession and reports of possible corporal punishment of K.B., as well as K.B.'s description of Donald K. as "scary," but Agency had investigated those concerns or allegations and they no longer existed from July 2013 to January 2014. Agency had no concerns that Donald K. was physically abusing K.B., that K.B.'s caregivers were not providing for his daily needs, that they had not adequately prepared themselves to have him in their home on a consistent basis, or that they were not fully committed to his care. Social worker Ausderan reiterated some of her conclusions about Mother's November 2013 visits with K.B. She did not agree that the behavior she witnessed represented a mother/child relationship.

The juvenile court found clear and convincing evidence K.B. was generally and specifically adoptable: his caregivers wanted to adopt him, and there were 39 families in San Diego that would adopt him. It found Mother's family reunification services had been terminated, which was an independent ground for terminating parental rights unless an exception applied. The court found Mother did not maintain regular visitation, negating any finding of a parent/child bond. However, the court went on to rule there was no evidence of any factor establishing a compelling reason that termination of Mother's parental rights would be detrimental to K.B., and there was no evidence that the

19

parent/child bond existed. The court adopted Agency's recommendation and terminated Mother's parental rights, finding clear and convincing evidence that there were no circumstances making termination of such rights detrimental to K.B. and it was in K.B.'s best interests to be adopted.

Mother appeals from the ensuing judgment.

## DISCUSSION

### I. *Denial of Section 388 Petition*

Mother contends the juvenile court abused its discretion by denying her section 388 petition because she presented substantial evidence she had addressed all of the concerns leading to K.B.'s removal from her, and the court's ruling was unsupported by substantial evidence. Specifically, Mother maintains the evidence showed she was no longer living with George S., but had moved to Northern California in December 2012 to live with her mother in a safe home with a room appropriate for K.B. She argues "there was no substantial evidence [she] was not exhibiting stable mental health or was failing to take her medication," but instead, had provided proof she was taking the medications for her conditions, was stable and happy, and was receiving mental health and psychiatric treatment. She argues there was no credible evidence to back up Agency's claims that she needed a substance abuse program; to the contrary, she argues there was no evidence she was enmeshed with drugs. Instead, she was living with her young daughter and though there had been referrals for general neglect, they were closed as unfounded.

A. *Legal Principles and Standard of Review*

Section 388 allows a parent of a dependent child to petition the court "to change, modify, or set aside any order of court previously made . . . ." On such a modification petition, the juvenile court must determine whether the parent has demonstrated by a preponderance of the evidence both that there was new evidence or a change of circumstances and that it would promote the child's best interests to change, modify or set aside the previous order. (See *In re Jasmon O.* (1994) 8 Cal.4th 398, 415; *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) " '[I]t is not enough for [the petitioner] to show *just* a genuine change of circumstances under the statute. The [petitioner] must show that the undoing of the prior order would be in the best interests of the child.' " (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615; see *In re D.B.* (2013) 217 Cal.App.4th 1080, 1094 [party moving under section 388 cannot simply rely on new evidence that may often arise under the passage of time, the party must show that the change in the order will be in the minor's best interests].)

Further, the petition must show changed, not changing, circumstances. (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615; *In re Casey D.*, *supra*, 70 Cal.App.4th at pp. 45-47.) And "[n]ot every change in circumstance can justify modification of a prior order. [Citation.] The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate. [Citations.] . . . The change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.)

21

The juvenile court's decision on the petition is addressed to its sound discretion and will not be disturbed on appeal in the absence of a clear abuse. (*In re Jasmon O.*, *supra*, 8 Cal.4th at pp. 415-416.) Under this standard, we do not reverse unless the court's decision exceeds the limits of legal discretion by being arbitrary, capricious, or patently absurd. (See *In re Stephanie M.* (1994) 7 Cal.4th 295, 318; *In re Katelynn Y.* (2012) 209 Cal.App.4th 871, 881.) " 'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " (*In re Stephanie M.*, at p. 319; *In re J.C.* (2014) 226 Cal.App.4th 503, 525-526.)

B. *Analysis*

Applying the foregoing principles, we cannot say the juvenile court abused its broad discretion in finding Mother had not demonstrated sufficiently changed circumstances, but only changing circumstances. We disagree with Mother's assessment of the evidence. Agency had been concerned about Mother's transient living situation, as well as her failure to comply with her prescription medication regimen or see her treating psychiatrist. The evidence showed Mother was not working and had not established her own residence, but had moved in with her mother in a month-to-month tenancy. In relation to Mother's four year history of unhealthy and uncertain living situations, the court reasonably concluded that Mother had shown "hopeful beginnings" of change, but not evidence to a preponderance that her circumstances had changed so significantly as to compel it to place K.B. with her.

Additionally, though Mother testified at the hearing she was in compliance and engaged in online psychiatric visits for the past few months, given Mother's history of dishonesty to social workers about her housing and attendance at NA/AA meetings, the juvenile court was well within its discretion to give little weight to her testimony. Mother did not present evidence to substantiate her claims; there was no written record of the prescriptions Mother was taking, no evidence from any treating psychiatrist or physician, and Grant's testimony was unspecific with little foundation: he admitted he only could reach an assumption that Mother was appropriately taking medications based on her coming in for refills at appropriate times. None of Mother's evidence rose to the level of competent medical evidence she was complying with a psychotropic medication regimen or seeing a physician on an appropriate basis. Even assuming the court accepted the truth of Mother's statements, it could reasonably conclude that four months of compliance was simply the start of change, and not evidence of genuine, significant change warranting a modification of its order.

Finally, given Mother's past drug use and 2012 relapse into synthetic drug use, it was Agency's recommendation throughout K.B.'s dependency and as late as 2013 that Mother maintain her sobriety and attend NA/AA meetings at least once a week and obtain a sponsor. But Mother admitted she was not attending such meetings or receiving any type of substance abuse aftercare. And, in September 2013 workers found her confused and appearing "stoned," and Mother could not show them she was taking anxiety medication as she claimed.

We reject Mother's argument that the juvenile court's ruling is as deficient and speculative as that in *In re M.V.* (2006) 146 Cal.App.4th 1048.[5] She maintains the court failed to consider her "critical" evidence that she was attending to her mental health issues or the absence of evidence she was abusing alcohol or drugs. But the juvenile court had before it Agency's April, July, October, November and January 2013 reports and addenda, as well as the social workers' testimony, and contrary to *M.V.*, the record is clear that the juvenile court understood the pertinent inquiry and Mother's burden on her motion. This case does not present the same circumstances as *M.V.*

Nor can we conclude the juvenile court erred by ruling Mother had not demonstrated that an order giving her custody was in K.B.'s best interests. "To understand the element of best interests in the context of a [section] 388 petition filed . . . on the eve of the [section 366.26] hearing, we turn to the Supreme Court's language in *In re Stephanie M.*, *supra*, 7 Cal.4th 295: '[A]t this point "the focus shifts to the needs of the child for permanency and stability" [citation] . . . . A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child.' " (*In re J.C.*, *supra*, 226 Cal.App.4th at p. 526.)

---

5    In *In re M.V.*, *supra*, 146 Cal.App.4th 1048, the appellate court found the juvenile court's findings prevented meaningful review: "[T]he findings before us are not sufficient to support a finding of changed circumstances or a finding that the proposed change was in M.V.'s best interests. Our conclusion is bolstered by the absence of any indication on the record that the court understood the necessity of finding that the agency had the burden of proving by a preponderance of the evidence that changed circumstances existed *and* that the proposed change was in M.V.'s best interests." (*Id*. at pp. 1059-1060.)

Here, the evidence established that K.B. had a stable placement with Edna and Walter H., who had been in his life since he was nine months old and who sought to adopt him and provide him permanency. They provided not only for his basic needs for emotional and developmental support and a stable and safe home, but also his needs for therapy and specialized education. Mother had had only five documented visits with K.B. since her move to Northern California (with a period of approximately 10 months where she did not visit him at all) and she showed no interest in scheduling weekly visitation with K.B. or participating in his education and therapy. Mother showed no interest in K.B.'s progress with his behavior. Further, social worker Ausderan contradicted Mother's account of her visits with K.B.; Ausderan did not observe the sort of close, loving relationship Mother described.

Mother suggests we should apply a "paradigm" developed in *In re Kimberly F.* (1997) 56 Cal.App.4th 519 in which the appellate court set out a list of nonexhaustive factors to consider in determining the child's best interest: the seriousness of the problem leading to dependency and the reason that problem was not overcome by the time of the final review; the strength of relative bonds between the dependent children to both parent and caretakers and the length of time a child has been in the dependency system in relationship to the parental bond; the degree to which the problem may be easily removed or ameliorated; and the degree to which it actually has been. (*Id.* at pp. 530-532.) These factors, however, focus primarily on the parent, and as the court in *In re J.C.* correctly observed, "the interests of the parent and the child have diverged by the point of a [section 366.26] hearing to select and implement a child's permanent plan." (*In re J.C.*,

*supra*, 226 Cal.App.4th at p. 527 [declining to apply *Kimberly F.* factors "if for no other reason they do not take into account the Supreme Court's analysis in *In re Stephanie M.*, applicable after reunification efforts have been terminated"]; see *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 254.)  Our focus must be on the child's need for permanency and stability; K.B. has a fundamental independent interest in belonging to a family unit, being protected from abuse and neglect, and to have a placement that is stable and permanent and allows the caretaker to make a full emotional commitment to him.  (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 317; *In re Marilyn H.* (1993) 5 Cal.4th 295, 306, 309.)

The question here, after Mother's reunification services have terminated, is whether Mother showed how her proposed change would advance K.B.'s need for permanency and stability.  (*In re J.C.*, *supra*, 226 Cal.App.4th at p. 527.)  It is not enough for Mother to merely assert she was doing better and that there was a sufficient bond such that reunification would be beneficial; she must rebut a presumption that continued placement with his caretakers was in K.B.'s best interest.  (*In re Marilyn H.*, *supra*, 5 Cal.4th at p. 310.)  We conclude on this record Mother did not establish that K.B.'s need for permanency and stability would be advanced by reunification efforts or by his return to her custody.  The juvenile court found Mother's testimony and evidence lacked sufficient weight and credibility to carry her burden of proof, and we will not reweigh the evidence or reassess credibility.  (See *In re Casey D.*, *supra*, 70 Cal.App.4th at pp. 52-53.)

26

II.  *The Juvenile Court Properly Concluded Mother Failed to Establish the Parental*

*Benefit Exception to Adoption*

A.  *Legal Principles*

At a section 366.26 permanency planning hearing, the juvenile court determines a permanent plan of care for a dependent child, which may include adoption.  (*In re S.B.*, *supra*, 164 Cal.App.4th at p. 296; *In re Casey D.*, *supra*, 70 Cal.App.4th at p. 50.)  "If the dependent child is adoptable, there is strong preference for adoption over alternative permanency plans."  (*In re S.B.*, at p. 297; *In re Michael G.* (2012) 203 Cal.App.4th 580, 588.)

In order to avoid termination of parental rights and adoption, a parent has the burden of showing that one or more of the statutory exceptions to termination of parental rights set forth in section 366.26, subdivision (c)(1)(A) or (B) apply.  (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469.)  The exceptions permit the court, "in *exceptional circumstances*," "to choose an option other than the norm, which remains adoption."  (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)  The so-called parental benefit exception applies when there is "a compelling reason for determining that termination [of parental rights] would be detrimental to the child due to . . . the following circumstances:  [¶] . . . The parents have maintained regular visitation and contact with the child *and* the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i), italics added.)  "The 'benefit' necessary to trigger this exception has been judicially construed to mean, 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In

27

other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' "  (*In re J.C.*, *supra*, 226 Cal.App.4th at pp. 528-529; see also *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.)  The parent asserting the exception has the burden of proving it by a preponderance of the evidence.  (*In re J.C.*, at p. 529.)

We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child.  (*In re J.C.*, *supra*, 226 Cal.App.4th at pp. 530-531; *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)  The latter determination "calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption . . . ."  (*In re J.C.*, at p. 531.)

B.  *Substantial Evidence Supports the Juvenile Court's Finding that Mother Did Not Engage in Regular Visitation and Contact with K.B.*

Mother contends she presented evidence of a loving parent-child relationship with K.B., both when they were together and living apart, so as to establish the beneficial parental relationship exception to adoption under section 366.26, subdivision (c)(1)(A).

28

On the issue of whether Mother maintained "regular visitation and contact" within the meaning of section 366.26, subdivision (c)(1)(B)(i), the juvenile court concluded: "[W]hile [Mother's] telephone contact was well-intentioned, . . . the period of time that went by without face-to-face visitation between mother and child was highly significant and there's no way that any reasonable person could conclude that that constituted regular visitation between the mother and child." It found regular visitation and contact with K.B. had not occurred, which prevented application of the beneficial parental relationship exception to adoption.

Mother argues the evidence does not support this finding. She asserts that while she lived in San Diego, she had good face-to-face visits with K.B., set appropriate limits, and remained in close proximity during visits. She points to the circumstances before K.B.'s second removal from her: evidence of two one-hour visits she had with K.B. in October 2010, in which she was reported to have acted appropriately and K.B. greeted and went easily to her.[6] Mother states that once she moved to Northern California, she "was able to build on the strong bonded relationship she had already established [in that she] talked to him on the phone as often and as long as she could."

Mother fails to acknowledge evidence that for about a 10-month period after her September 2012 move to Northern California (from approximately September 2012 to June 2013), she did not see K.B. at all. Reports indicate that as of March 2013, Mother was only engaging in once-a-week telephone contact with K.B., having brief

---

[6] The visit monitor, however, could not report for either visit that K.B. did not want the visit to end.

conversations with him without requesting any visitation or inquiring about his well-being.  At the section 366.26 hearing, Mother admitted that during some but not all weeks she spoke with K.B. only once or twice over the phone, the longest call being 10 minutes, though she claimed she tried to call every day and left messages.  She visited K.B. five times from the time of her September 2012 move to the January 2014 section 366.26 hearing, despite the fact Agency had never placed any restrictions on the number of times she could travel and see him in a supervised setting.  Mother does not claim that K.B.'s caregivers prevented her from engaging in more frequent visitation or contact, and there is no evidence they did so.

This court has made clear that sporadic visitation is insufficient to satisfy this prong of the beneficial relationship exception.  (*In re C.F.* (2011) 193 Cal.App.4th 549, 554.)  "Regular visitation exists where the parents visit consistently and to the extent permitted by court orders."  (*In re I.R.* (2014) 226 Cal.App.4th 201, 212, citing *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1537.)  We conclude evidence of Mother's minimal visitation and contact here—five visits in the span of about 16 months, and brief telephone contact once a week—amply supports the juvenile court's finding that Mother had not satisfied this prong.

C.  *The Juvenile Court Did Not Abuse its Discretion in Finding The Benefit of Maintaining the Parent-Child Relationship Did Not Outweigh the Benefit of Adoption*

Mother contends she demonstrated it was in K.B.'s best interests to continue his relationship with her.  Distinguishing cases in which courts found no evidence of a beneficial relationship (*In re Autumn H.*, *supra*, 27 Cal.App.4th 567; *In re C.F.*, *supra*,

193 Cal.App.4th 558; *In re Casey D.*, *supra*, 70 Cal.App.4th 38), Mother argues she did not relapse as the mother did in *In re C.F.* but remained "totally focused" on K.B., she was "not merely a friendly visitor" to K.B., and she "satisfied all of [K.B.'s] needs when they were together." According to Mother, K.B. relied on her, was never uncomfortable with her, and "came home in good spirits and good health. . . ."

To meet this prong of the exception, Mother "must show more than frequent and loving contact or pleasant visits," but that she "occupies a parental role" in K.B.'s life. (*In re C.F.*, *supra*, 193 Cal.App.4th at pp. 555, 558-559; *In re Mary G.* (2007) 151 Cal.App.4th 184, 207.) As we have stated, Mother must show her "relationship promotes the well-being of [K.B.] to such a degree as to outweigh the well-being [he] would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

Additionally, Mother must not only demonstrate the positive aspects of her relationship with K.B., but "must show [he] would suffer detriment if his . . . relationship with the parent were terminated." (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555.) Indeed, severing of the relationship must " 'deprive the child of a *substantial*, positive emotional attachment such that the child would be *greatly* harmed.' " (*In re Marcelo B.* (2012) 209

31

Cal.App.4th 635, 643.) Mother " 'may not derail an adoption merely by showing [K.B.] would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent.' " (*Ibid.*)

Mother's showing again focuses on early visits between her and K.B. before his second removal from her, and ignores the fact that K.B. had been living for more than half his life with his caretakers, who provided for all of his physical, emotional and special needs, and with whom K.B. wished to live. There is no bonding study establishing a primary maternal relationship, and Mother's evidence disregards the social worker's conclusions that she had not demonstrated an ability to provide for K.B.'s physical, emotional or medical needs, and simply did not share a parent/child relationship with K.B. Mother manifestly has not shown that severing her natural parent/child relationship would deprive K.B. of a substantial, positive, emotional attachment such that he would be greatly harmed.

We are unpersuaded by Mother's comparison of these circumstances to other cases, including those in *In re S.B.*, *supra*, 164 Cal.App.4th 289. In *In re S.B.*, this court reversed a finding that the beneficial parent-child relationship exception did not apply after concluding a father had established his daughter S.B. would be greatly harmed by the loss of the significant positive relationship she shared with him. The father had complied with " 'every aspect' " of his case plan, frequently visited his daughter, and was patient and loving to her. (*Id*. at p. 298.) A bonding study described the bond between the father and child and parent as " 'fairly strong' or 'moderate.' " (*In re S.B.*, at p. 295.)

32

The psychologist who had conducted the study testified there was a potential for harm to S.B. were she to lose the parent-child relationship. (*Id.* at p. 296.)

We explained: "For the first year after she was removed from parental custody, S.B. continued to display a strong attachment to [father]. She was unhappy when visits ended and tried to leave with [father] when the visits were over. [Father] was sensitive to S.B.'s needs. Social worker Brown noted, '[father] consistently puts his daughter['s] needs and safety before his own.' S.B. responded to [father's] attention. During one visit, S.B. 'sat on [father's] lap . . . [and] proudly showed off the pink tennis shoes he had bought her.' The record clearly establishes S.B. initiated physical contact with [father]. Dr. Kelin observed that S.B. 'ran into [father's] arms, again getting her father to pick her up.' [Father] and S.B. shared an affectionate relationship. S.B. 'nestle[d] up to [father's] neck' and 'whispered and joked with him.' The record also shows S.B. loved [father] and wanted their relationship to continue. S.B. whispered to her father, 'I love you.' As [father] started to leave, S.B. stated, 'I'll miss you,' and then she gave him another hug. S.B. spontaneously said, 'I wish I lived with you and Mommy and Nana.' " (*In re S.B.*, *supra*, 164 Cal.App.4th at p. 298.) We concluded: "The record shows S.B. loved her father, wanted their relationship to continue and derived some measure of benefit from his visits. Based on this record, the only reasonable inference is that S.B. would be greatly harmed by the loss of her significant, positive relationship with [father]." (*Id.* at pp. 300-301.)

This case is readily distinguishable from *In re S.B.* In particular, unlike *S.B.*, there is no indication K.B. ever expressed any desire to live with Mother. Rather, social worker Blair reported that as of age four, K.B. stated he wanted to live with his grandmother Edna and Donald K. Based on the social workers' reports, K.B. plainly did not share the kind of affection for Mother that S.B. expressed for her father. K.B. did not display such an emotional attachment to Mother, but easily separated from her at the conclusion of his visits, and readily returned to his caregivers. Further, though Mother showed some progress in her living situation, she was unable to show she had maintained her psychotropic medication regimen or was participating in substance abuse programs to avoid falling back into drug use. We have repeatedly cautioned that *S.B.*'s holding must be limited to its particular and "extraordinary" facts (see *In re Jason J.* (2009) 175 Cal.App.4th 922, 937; *In re C.F.*, *supra*, 193 Cal.App.4th at pp. 558-559), and we so limit its application here. Given the factual dissimilarities, *In re S.B.* is not controlling.

## DISPOSITION

The judgment is affirmed.

O'ROURKE, J.

WE CONCUR:

BENKE, Acting P. J.

IRION, J.

34